# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2890

_____

United States of America,                    *
                                             *
        Plaintiff - Appellee,                *
                                             *
v.                                           *
                                             *
Miguel Calderin-Rodriguez,                   *
                                             *
        Defendant - Appellant.               *


_____
                                   Appeals from the United States
No. 99-2891                        District Court for the
_____                        District of Nebraska.

United States of America,                    *
                                             *
        Plaintiff - Appellee,                *
                                             *
v.                                           *
                                             *
Alberto Martinez-Mostelier,                  *
                                             *
        Defendant - Appellant.               *


_____

No. 99-2892

_____

United States of America,                    *
                                             *
        Plaintiff - Appellee,                *
                                             *
        v.                                   *
                                             *
Ricardo Gorrin,                              *
                                             *
        Defendant - Appellant.               *


                    _____

                    No. 99-3055
                    _____

United States of America,                    *
                                             *
        Plaintiff - Appellee,                *
                                             *
        v.                                   *
                                             *
Ernesto Contreras-Silverio,                  *
                                             *
        Defendant - Appellant.               *
                              _____

                    Submitted:  May 8, 2000

                    Filed:  March 29, 2001
                              _____

Before McMILLIAN, JOHN R. GIBSON, and BEAM, Circuit Judges.
                              _____

JOHN R. GIBSON, Circuit Judge.


                              -2-

Miguel Calderin-Rodriguez, Alberto Martinez-Mostelier, Ernesto Contreras, and Ricardo Gorrin were each convicted of conspiracy to distribute cocaine, methamphetamine, and/or amphetamine, in violation of 21 U.S.C. § 846 (1994). The indictment named six other co-conspirators, five of whom pleaded guilty, and one of whom has never been apprehended. Calderin-Rodriguez was sentenced to 225 months imprisonment, Martinez-Mostelier to 178 months, Contreras to 92 months, and Gorrin to 80 months. On appeal, the four argue[1] that there was insufficient evidence of conspiracy; that the district court[2] erred in admitting audio tapes of drug transactions and in allowing the jury to view transcripts of those tapes; that the court should have stricken testimony of one of the government's witnesses because the government violated the court's sequestration order; and that the court erred in imposing the sentences. We reject these and various other arguments. We affirm the convictions and sentences imposed.

The appellants and their co-conspirators sold cocaine and methamphetamine, operating principally out of two apartment buildings in the town of Hastings, Nebraska. The indictment covered the period of August 1, 1996 through May 17, 1998. The government's case consisted of testimony by undercover police and confidential informants who made controlled purchases of drugs from the group, audio tapes of those transactions, testimony by drug users who habitually bought drugs from the group, and evidence seized during searches of the apartments. The government also introduced the actual drugs purchased in the controlled transactions, as well as other drugs found in a hotel room after Gorrin had stayed there.

---

[1]Although the appellants have filed separate briefs, three of them have adopted each others' arguments by reference.

[2]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.

Kiley Bera gave the police entree to the drug world in Hastings. In late 1996 and 1997, she was in regular attendance at the apartment of Sammy Howell, a drug dealer who lived down the street from her. At Howell's she encountered Miguel Calderin-Rodriguez and Alberto Martinez-Mostelier, who came to Howell's about every day to deliver an ounce or so of methamphetamine and to collect money from Howell for past credit purchases. Later, she began to encounter Ignacio Ramirez at Howell's. Ramirez was always there with either Calderin-Rodriguez or Martinez-Mostelier, or both, who would often actually deliver the drugs to Howell and collect the money from him, but who would turn the money over to Ramirez. Between January 1997 and November of that year, Ramirez was at Howell's almost every day.

Bera visited the apartment of Ramirez, Calderin-Rodriguez, and Martinez-Mostelier at 309 North Lexington, and she saw Ramirez and Martinez-Mostelier in the apartment with a scale and powder all over a table. Ramirez later moved to 315 North Bellevue, #1, where he lived with Ricardo Gorrin; Bera visited Ramirez there regularly from about October 1997 to April 1998, and she almost always saw methamphetamine and methamphetamine transactions there. She named eight of Ramirez's customers, not counting the other members of the conspiracy. Ramirez told her he didn't like to sell small amounts, so he would front methamphetamine to Geovoni San Pedro Lopez and Ernesto Contreras (who lived upstairs at 315 North Bellevue, #2), who would make the smaller sales. Bera saw Ramirez with between $4,000 and $5,000 cash, and he told her on different occasions that he was going out of town to pick up "crank" or "a package."

Bera also knew Gorrin; she once saw him sell some cocaine to a customer when Ramirez wasn't home. Ramirez told Bera in February or March 1998 that he was angry with Gorrin because Gorrin had fronted $3,000 worth of Ramirez's methamphetamine to a woman.

Bera also testified about seeing Ramirez breaking up a large brick of methamphetamine, then weighing and packaging it. He put the small amounts into a plastic bag, then twisted the top and melted it with a lighter. Witness after witness testified that the drugs they got from the members of the alleged conspiracy were packaged in this way. Rita Hemmer, an experienced drug enforcement agent, said that she had never seen this characteristic packaging in any other case.

Another witness who bought drugs from the group was Clayton Smith, who testified that he bought methamphetamine from Ramirez about twenty times at the Bellevue apartment. Smith also bought from Martinez-Mostelier at 309 North Lexington, which was known as "the office," and the methamphetamine was packaged in the characteristic way already described. He bought cocaine and methamphetamine from Martinez-Mostelier for about six months. Once, when he went to buy drugs from Ramirez, Ramirez was not home, but Calderin-Rodriguez was there. Calderin-Rodriguez left the apartment, walked in the direction of the office, and returned with some methamphetamine for Smith, packaged in the characteristic way. Smith also purchased methamphetamine and cocaine from Contreras in the same type packages. At other times he bought from Gorrin when Ramirez was not home. Smith said Gorrin acted as doorman. Smith said, "[I]t was pretty much a network thing there, you know, if one didn't have it, they would point which way to go to whoever had it."

Lisa Doyen was another regular drug purchaser who testified that she bought methamphetamine from Calderin-Rodriguez, Ramirez, and Martinez-Mostelier. She testified that she saw Calderin-Rodriguez sell methamphetamine to five to fifteen other people.

Jeremy King also testified that he and his friends bought methamphetamine and cocaine from Martinez-Mostelier and Calderin-Rodriguez. On a couple of occasions, when Martinez-Mostelier or Calderin-Rodriguez didn't have the drugs, they sent him to Ramirez. Once, when King came to buy cocaine from Martinez-Mostelier and

Calderin-Rodriguez, he was greeted with suspicion. Someone patted him down, and Calderin-Rodriguez laid a gun on the table. Another time, after he bought some methamphetamine from Calderin-Rodriguez, he complained that it looked short. Another indicted co-conspirator, Leo Parra, gave King some methamphetamine out of his pocket to make up for the underweight package.

Charles Lahiff was yet another regular drug purchaser who testified about goings-on at the office. He ran into Ramirez there and bought methamphetamine from him frequently after that. He bought methamphetamine and cocaine from Calderin-Rodriguez beginning in 1996 and from Martinez-Mostelier at about the same time. Lahiff participated in nine controlled buys in cooperation with the police. He wore a body wire that transmitted radio waves during these transactions. The police taped the transmissions, and the government introduced the tapes into evidence. Participants in the taped transactions with Lahiff included Calderin-Rodriguez, Contreras, and Gorrin, as well as other indicted co-conspirators. Often, more than one conspirator was involved in a single transaction. For instance, on May 1, 1998, Lahiff went to the office to buy from someone who was not indicted in this case; he ended up actually buying the drug from Contreras, but while Contreras was out picking up the merchandise, Calderin-Rodriguez forced Lahiff to sniff cocaine. Later testimony revealed that it is a common practice for drug dealers to make customers ingest drugs in their presence to prove they are not cooperating with police.

The two undercover police who participated in controlled buys were Rita Hemmer and Tony Keiper.[3] Hemmer made eleven purchases from members of the conspiracy from October 14, 1997 to May 26, 1998. Hemmer was introduced to the group by Bera, who accompanied her during eight of the transactions. For each

---

[3]Keiper went along with Lahiff on one purchasing expedition, in which they bought methamphetamine from a member of the conspiracy.

transaction, either Bera or Hemmer wore a transmitter so that Officer Ron Gardner could monitor the progress of the transaction and record it. Hemmer purchased methamphetamine from each of the appellants in this case, and many of her purchases involved cooperation between more than one of the appellants or between an appellant and another indicted co-conspirator. For instance, on October 28, 1997, Hemmer and Bera went to the office and ordered methamphetamine from Calderin-Rodriguez. Martinez-Mostelier, who was also there, fetched the drugs from the bedroom and delivered them to Hemmer. Similarly, on January 13, 1998, Hemmer and Bera went to Martinez-Mostelier's residence (after he had moved from the North Lexington apartment) and ordered methamphetamine. Martinez-Mostelier left for five to ten minutes, and shortly after he returned, one of the other indicted co-conspirators arrived with the drugs. Again, on March 25, 1998, Hemmer ordered a quantity of methamphetamine from an indicted co-conspirator who did not have the drugs on hand. He made a telephone call, speaking in Spanish,[4] and Hemmer understood the word "Neto." The co-conspirator sent her to the North Lexington building, where Contreras delivered half the ordered amount of drugs and where Calderin-Rodriguez later arrived, delivering the other half of the order. In the audio tape of the transaction with Contreras, Hemmer asks, "Are you Neto?" and Contreras answers, "Yeah." This pattern of cooperation among the appellants and other co-conspirators was remarked upon during one of the taped conversations. Because Hemmer wanted more methamphetamine than Ramirez had, she asked him if "those guys upstairs" had any. Ramirez responded: "Nobody–when I don't got any, nobody got." Another time Hemmer called Contreras looking for methamphetamine. Contreras had none, and he told Hemmer that Ramirez had it all and that he, Contreras, got his drugs from Ramirez.

There was also testimony from police who executed a search warrant at 315 North Bellevue, #2. They found Contreras, Martinez-Mostelier and others there. There was methamphetamine in a coat that officers had seen Martinez-Mostelier

---

[4]The appellants are Cubans, who communicated primarily in Spanish.

wearing earlier. An officer who executed a search warrant at 315 North Bellevue, #1 and arrested Gorrin there testified that police found a scale, plastic bags, rubber gloves, and other drug packaging equipment at the apartment.

A housekeeper at a Hastings motel identified seven packets she found while cleaning a room that had been registered to Gorrin the day before. The policeman to whom she delivered the packages had the contents analyzed; the packets contained cocaine.

## I.

The appellants argue that there was insufficient evidence to show that they entered a conspiracy. They say that the evidence only shows that they "may have been involved in some illegal activity," but not that there was any sort of agreement.

In reviewing a jury verdict, we examine the evidence in the light most favorable to the government, giving the government the benefit of all favorable inferences. Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Frayer, 9 F.3d 1367, 1371 (8th Cir. 1993). We can reverse for insufficiency of the evidence only if no reasonable jury could have found the defendant was guilty beyond a reasonable doubt. Frayer, 9 F.3d at 1371. A person who knowingly contributes his efforts to further the criminal objects of a conspiracy will be deemed to have joined the conspiracy. Id.

There was overwhelming evidence, which we have outlined above and which would fill too many pages to retell in full, that the appellants in this case and others charged in the indictment cooperated in the drug enterprise headed up by Ramirez. In many, perhaps most, of the sales described, more than one alleged co-conspirator contributed his efforts, with no hint that they were competing with each other for sales

or that it made any difference to them whether one or the other of them sold the drug.[5] Kiley Bera saw Calderin-Rodriguez and Martinez-Mostelier collect money and then deliver it to Ramirez. If a customer approached one of them when he had no merchandise, he would direct the customer to someone else in the group who had drugs to sell. When Jeremy King complained that a purchase from Calderin-Rodriguez was underweight, another alleged co-conspirator made up the shortfall with drugs from his own pocket. Purchases from different members of the alleged conspiracy were all packaged in the same characteristic way, with the melted plastic. Kiley Bera saw Ramirez heat-sealing such packages. There was enough evidence to support the conspiracy conviction.

## II.

The appellants contend that the district court erred in refusing to strike the testimony of witness Charles Lahiff because Lahiff discussed his testimony with the prosecutor and another witness during the evening recess midway through his direct testimony.

Before trial the defendants requested that the witnesses be sequestered. The court responded that such a request must be automatically granted under Federal Rule of Evidence 615, "so our witnesses will be sequestered." The court further told counsel, "I want you to instruct your witnesses that they're not to talk to each other about their testimony. That goes for the government as well as for the defendants so–

---

[5]There were occasional hints of discord among the members of the group. Once Ramirez told a customer that the person upstairs (presumably Geovoni San Pedro Lopez, an indicted co-conspirator) was stealing his customers and Ramirez wanted him hurt. Bera reported that Ramirez was angry with Gorrin because he had given one woman $3000 worth of Ramirez's drugs on credit. These incidents were extremely minor in the context of all the testimony showing cooperation among the group.

and, obviously, their witnesses are going to have to talk to counsel, but they should not talk to each other about their testimony."

Lahiff's testimony began late in the day of February 25, 1999, and had hardly started when it was time for the evening recess. The next morning the Assistant United States Attorney began by asking Lahiff whether he had thought over several aspects of his testimony from the day before; Lahiff then corrected his testimony about which police officers he had first worked with as a confidential informant, when he met Ramirez, and other similar details, refreshing his recollection by referring to reports he had prepared at the time of the events. Lahiff mentioned that, since his testimony the day before, he had spoken to Glenn Kemp, the officer with whom he had first worked. Throughout Lahiff's testimony, he had to refresh his recollection by referring to written reports and other documents and listening to tapes. He said that he had been a heavy user of methamphetamine and cocaine for the three-year period preceding April 1998, taking between three and four grams per day of some combination of these drugs. During cross-examination, counsel asked him about how he came to correct his testimony, and Lahiff said that he had looked over his notes and met with Assistant United States Attorney Gillan. "With Mr. Gillan's help I realized what I said was wrong." Kemp testified immediately after Lahiff. The defendants moved to strike Lahiff's testimony, and the court denied the motion.

The appellants now contend not only that the district court erred in denying their motion, but that the denial violated their Sixth Amendment right to confront the witnesses against them by making their cross-examination of Lahiff less effective than if he had not corrected his errors in advance of cross examination. There is no legal support for their constitutional argument, but their claim of trial error must be analyzed in detail.

Appellants object more vociferously to the meeting between the prosecutor and Lahiff than to that between Lahiff and Kemp, but the meeting between Lahiff and the

prosecutor violated neither Federal Rule of Evidence 615 nor the sequestration order in this case. Rule 615 provides simply: "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses . . . ." This rule does not by its terms forbid an attorney from conferring with witnesses during trial. Cf. United States v. Kindle, 925 F.2d 272, 276 (8th Cir. 1991) (Rule 615 does not require court to forbid contact between DEA case agent and witness during trial). Nor is it inherently unethical for a lawyer to speak to a witness once the witness has begun to testify. See United States v. De Jongh, 937 F.2d 1, 3 (1st Cir. 1991); 29 Charles Alan Wright and Victor James Gold, Federal Practice and Procedure § 6243, at 64 (1997) ("During the course of a trial, an attorney customarily consults out-of-court with his client and other witnesses."). Assuredly, the district court, in exercise of its discretion in regulating the conduct of the trial, may impose restrictions on an attorney's contact with witnesses during trial, not only to prevent unethical coaching, but also simply to preserve the status quo during breaks in testimony. See, e.g., Perry v. Leeke, 488 U.S. 272, 281-84 (1989) ("It is a common practice for a judge to instruct a witness not to discuss his or her testimony with third parties until the trial is completed."). In this case, however, the district court's order explicitly assumed that the attorneys would talk to witnesses.

Even if the conference between counsel and Lahiff had been improper under the sequestration order, the district court would still have wide latitude in deciding how to respond to the impropriety. Kindle, 925 F.2d at 276; see United States v. Covington, 133 F.3d 639, 645 (8th Cir. 1998) (district court's response to improper communication between witnesses reviewed for abuse of discretion). There is no convincing showing of prejudice in this case, since it was obvious from Lahiff's testimony on the second day that he was relying on the written reports to refresh his recollection; he was cross-examined about the interview with Gillan; and even without the conference, the government would likely have been able to help Lahiff correct his earlier testimony by showing Lahiff the reports in court as prior inconsistent statements or to refresh his recollection. Lahiff freely admitted that his drug use affected his memory, and he

-11-

depended heavily throughout his testimony on written documents and tapes to refresh his recollection. Moreover, the subjects on which Lahiff corrected himself were not crucial, especially in view of the mountain of damaging evidence against the appellants.

Lahiff's meeting with Glenn Kemp is of more concern, as it was clearly prohibited by the district court's sequestration order telling the attorneys to keep their witnesses from talking to each other about their testimony. However, the Assistant United States Attorney voluntarily brought up the meeting during Lahiff's testimony with no apparent consciousness of wrongdoing, and the appellants did not even cross-examine Kemp or Lahiff on the subject. Without a showing of prejudice, the district court did not abuse its discretion in refusing to strike Lahiff's testimony on the basis of his meeting with Kemp.

We therefore reject the appellants' contention that permitting Lahiff's testimony constituted trial error. We also reject the appellants' assertion that the conference with Lahiff entitled them to a mistrial on the ground of prosecutorial misconduct.

III.

Contreras contends that the indictment was duplicitous because it alleged conspiracy to distribute cocaine, amphetamine, and methamphetamine, all in violation of 21 U.S.C. § 841(a)(1) (1994). We rejected the same argument in United States v. Moore, 184 F.3d 790, 793 (8th Cir. 1999), cert. denied, 120 S. Ct. 1174 (2000). In Moore, as in this case, an indictment for conspiracy to distribute a controlled substance alleged that the conspiracy involved more than one drug. We held: "Enumerating the controlled substances did not render count I duplicitous." Id. The indictment was not duplicitous.

IV.

Much of the strength of the government's case came from audio recordings made by Officer Ron Gardner as he monitored the undercover drug purchases. The undercover agents and confidential informants wore body wires that transmitted radio signals while they were buying drugs from the members of the conspiracy. Officer Gardner testified that he waited in a car near the apartments where the transactions took place, listening to the transmitted conversations and recording them on a cassette tape recorder. Gardner had successfully used this equipment on thirty to forty earlier occasions, and he checked his equipment each time before he used it. He also listened to each tape recording after the transaction. Gardner testified that when he listened to the tapes, there were no additions or deletions to the tape recordings and that they appeared to be in the same condition at trial as when he had made them. Kiley Bera, Rita Hemmer, Tony Keiper, and Charles Lahiff, the participants in the recorded conversations, testified at trial and were available for cross-examination. Keiper, Hemmer, or Lahiff testified about the substance of each conversation for which a tape was introduced.

Because the conversations were partly in Spanish, the government retained Jeck-Jerard Navarette, a translator, who enhanced the tapes by using a software program to reduce background noise and increase the volume of the speech. Navarette had performed this digital enhancement more than fifty times, and he testified that it did not add or subtract anything to the tapes, but merely modified the volume in order to make the words more intelligible. Navarette, working together with the agents and informants, listened to the digitally enhanced recordings many times to make a transcript of the words spoken, to translate the Spanish into English, and to identify the speakers when possible. The court allowed the jury to look at the transcripts as an aid while they were listening to the tapes, but did not allow the jury to have the transcripts during deliberation.

Gorrin argues that the admission of the digitally enhanced recordings was error because the court should have required a <u>Daubert</u>[6] hearing to lay the foundation for the tapes as scientific evidence. We have not required as a foundation for admission of tapes into evidence that an expert testify how tape recorders work. Instead, in <u>United States v. McMillan</u>, 508 F.2d 101, 104 (8th Cir. 1974), we set out seven foundational requirements for admission of tapes, some of which depend on evidence that the machine does work, but none of which require that the witness understands the scientific principles involved in tape recording. We see no distinction between the foundation required for the tape recorder and that for the digital enhancement program, which, from the point of view of a listener, simply improves the quality of the recording. If the capacity for digital enhancement were built into the tape recorder itself, rather than a separate step being required, the admissibility of the resulting tapes would clearly be governed by <u>McMillan</u>. There is nothing in the use of this separate device that should change our analysis.

The first requirement of <u>McMillan</u>, "that the recording device was capable of taking the conversation now offered in evidence," <u>id.</u>, was amply satisfied in this case by testimony that Navarette had listened to the tapes before and after enhancement and he found the enhanced version to be "considerably more audible." <u>See</u> <u>United States v. McCowan</u>, 706 F.2d 863, 865 (8th Cir. 1983) (per curiam) ("The very fact that the tape recordings exist establishes that the recording device was capable of picking up sounds and taking the conversation offered."); <u>United States v. Roach</u>, 28 F.3d 729, 733 (8th Cir. 1994). Navarette's testimony that he had successfully used the software program about fifty times in the past also bolsters the conclusion that the program worked. The second requirement, that the operator of the device was competent to operate it, was satisfied by the same evidence. <u>See</u> <u>McCowan</u>, 706 F.2d at 865. ("Howard testified that he learned how to use the recorder on the day he made the tapes. This fact, and the fact that Howard successfully made the tape recordings,

---

[6]<u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993).

satisfied the competency requirement of the second element of the <u>McMillan</u> test.") The third and fourth <u>McMillan</u> requirements, that the recording is authentic and correct and that no changes, additions or deletions have been made, add a significant guarantee of trustworthiness. In this case, these requirements have been satisfied by the testimony of Officer Gardner, who listened to the original radio transmissions, that the tapes were accurate portrayals of the conversations. Although technically a "change" has been made by the digital enhancement, Navarette testified that it only changed the volume of sounds. Volume adjustment is commonly used in playing back recordings and is not legally significant. There is no dispute about the remaining <u>McMillan</u> requirements. We therefore conclude that there was an adequate foundation for admission of the tapes.

Contreras argues that the court erred in allowing the jury to look at transcripts which contained voice identifications and date headings. One of the principal reasons for having a transcript is to help identify the speakers on the tape. <u>McMillan</u>, 508 F.2d at 105. The foundation for the voice identifications and headings was established by testimony of the participants in the conversations and Officer Gardner. The district court carefully complied with our instructions in <u>McMillan</u> by only allowing the jury to look at the transcripts as the tapes were played in the courtroom and by cautioning the jury: "The tapes in this case are what you should be relying on. If for some reason as you listen you think that what you hear is different than what's on the transcript, then you should adopt what's on the tape." Nor have the appellants directed us to any errors in the transcripts' voice identifications or date headings. <u>See</u> <u>United States v. Britton</u>, 68 F.3d 262, 264 (8th Cir. 1995) (without specific allegations of error, we must assume transcript accurate). The use of the transcripts was not an abuse of discretion.

Martinez-Mostelier contends that the tape of the transaction on January 13, 1998 should not have been admitted because there is a gap on the tape and because portions of the tape are inaudible. The transcript shows the gap with the word "BREAK." Officer Gardner testified that he blew a fuse in the car where the recorder was plugged

in and lost power until he could change the fuse. Rita Hemmer, who participated in the January 13 transaction, testified about what was said during the transaction, and both she and Kiley Bera were available for cross examination about what happened during the gap. Furthermore, review of the transcript indicates that the participants and translator were able to make out a great deal of what was said, and the inaudible portions did not render the tape as a whole untrustworthy. See United States v. Huff, 959 F.2d 731, 737-38 (8th Cir. 1992). The district court did not abuse its discretion in admitting this tape. See id. (standard of review is abuse of discretion).

V.

Contreras contends that the district court erred in refusing to sever his case from the other appellants'. Denial of a motion for severance is reviewed only for abuse of discretion, resulting in definite prejudice. United States v. Delpit, 94 F.3d 1134, 1143 (8th Cir. 1996). Joinder is favored for conspiracy cases, United States v. Mercer, 853 F.2d 630, 632 (8th Cir. 1988), and there is no showing any of the appellants were prejudiced by joint trial in this case.

VI.

The appellants raise various sentencing arguments. Martinez-Mostelier argues that the district court erred in its calculation of the amount of drugs attributable to him, and Contreras argues that the court erred in giving him a two-level enhancement for possession of a gun in connection with the drug offense. Calderin-Rodriguez makes both these arguments. The questions of what quantity of drugs was attributable to a defendant and whether possession of a gun was sufficiently connected to a drug offense to warrant enhancement under U.S.S.G. § 2D1.1(b)(1) are questions of fact, reviewable only for clear error. United States v. Fairchild, 122 F.3d 605, 614 (8th Cir. 1997) (gun); United States v. Smith, 49 F.3d 362, 365 (8th Cir. 1995) (drug quantity).

Under U.S.S.G. § 2D1.1(b)(1), a defendant's base offense level is increased by two levels "[i]f a dangerous weapon (including a firearm) was possessed."  "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  Id., comment. (n.3).  The government bears the burden of showing that a weapon was present and that it is not clearly improbable that the weapon was connected with the crime.  United States v. Belitz, 141 F.3d 815, 817 (8th Cir. 1998).

Police searching Contreras's apartment at 309 North Lexington, #9 discovered a 25-caliber semiautomatic handgun under his mattress.  The magazine was out of the gun and contained five rounds of ammunition.  Contreras  objected to enhancement of his offense level for possession of this gun.  After a hearing, the district court found that the increase was warranted by the evidence, and this finding is not clearly erroneous.

Calderin-Rodriguez also contends that he should not have received an increase for possession of a gun.  The district court relied on the testimony of Jeremy King at trial that once when he went to buy drugs from Calderin-Rodriguez, he was searched and Calderin-Rodriguez had a gun in his hand.  Calderin-Rodriguez argues that this testimony is not trustworthy because no one else corroborated it.  However, none of the people King said were present at the time of the incident testified at trial.  So if there is no corroboration, neither is there any contrary evidence.  The district court recounted the details in King's testimony about the kind of gun Calderin-Rodriguez had, which apparently convinced the court that the incident really happened.  The court's finding is not clearly erroneous.

Calderin-Rodriguez attacks the district court's finding that at least five kilograms of methamphetamine were attributable to him.  He particularly attacks King's testimony that Calderin-Rodriguez had a five- to- six pound chunk of methamphetamine.  The district court did not take this weight at face value, but stated that the weight of the chunk must have been at least one kilogram.  The district court also considered

Calderin-Rodriguez's argument that other witnesses' estimates of drug amounts were excessive, but found that, "I get to five kilograms very quickly, even discounting some of the testimony." Calderin-Rodriguez asks us to discard the district court's credibility determinations, but it is clear from the sentencing transcript that those determinations were cautious and well-supported.

Martinez-Mostelier also attacks the findings on drug amount, but the transcript of his sentencing shows that the district court carefully considered his objections to various witnesses' testimony and still found Martinez-Mostelier was responsible for at least five kilograms of methamphetamine:

> I've not only reviewed my trial notes, but I have also reviewed portions of the transcript of the testimony of Kiley Bera and Jeremy King, Clayton Smith and some of the others. Even discounting all of their testimony, it seems to me that there isn't any question that the amount of methamphetamine that was involved and which is reasonably chargeable to this defendant exceeds five kilograms.

The district court's finding is not clearly erroneous.

We affirm the appellants' convictions and the sentences imposed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.